## Case No. 17,429.

### WESTCOT v. BRADFORD.

[4 Wash. C. C. 492.] [1]

Circuit Court, D. New Jersey. Oct. Term, 1824.

SEIZURE BY COLLECTOR—SENTENCE OF CONDEMNATION—SUIT BY INFORMER—COMPENSATION—ADMIRALTY JURISDICTION — APPEAL AND WRIT OF ERROR.

1. After a sentence of condemnation upon a seizure by the collector for a violation of the revenue laws of the United States, and the proceeds being brought into court, a petition to the court by the informer to be paid the proportion of the forfeiture allowed him by law, is an original suit in the admiralty, and from the decree given therein an appeal lies to the circuit court.

[Approved in U. S. v. George, Case No. 15,-197.]

2. If part of the fund in court be the produce of the coasting license bond, recovered by an action on that bond, the petition of the informer for his proportion of the penalty so recovered, is a proceeding at common law, and from the sentence on the petition no appeal lies. A judgment of the inferior court in a case at common law, cannot be reversed by the circuit court, but upon a writ of error.

[Cited in Ruddick v. Billings, Case No. 12,-110; Wheaton v. U. S., Id. 17,487.]

3. If after seizure the informer is entrusted by the collector with the custody of the property, and he endeavours to defraud the revenue of the fruit of the seizure, by connivance with the party informed against, in which attempt he fails, this will not defeat his right to his part of the forfeiture. His right as informer cannot be affected by his misconduct as agent.

4. Courts of common law, as well as of admiralty, have jurisdiction over funds brought into court under their process, and to hear and determine the claims of third persons to a distribution of the fund. In case of money brought in under a sentence of condemnation, the court, before it is paid over to the collector, may decree to the informer his proportion.

[Cited in Hooper v. 51 Casks of Brandy, Case No. 6,674; 50,000 Cigars, Id. 4,782. Approved in U. S. v. George, Id. 15,197.]

[Cited in Lapham v. Almy, 13 Allen, 304; Rice v. Thayer, 105 Mass. 260.]

5. How far an information given to the collector, as to one thing, may or may not be considered as extending to others, so as to warrant the conclusion that the forfeiture was recovered in pursuance of such information?

6. If the information be in writing, the party may nevertheless give parol proof or other information given, leading to the seizure of articles not mentioned in the written information.

[Cited in The City of Mexico, 32 Fed. 106.]

7. Declarations of an agent, so far as they constitute part of the res gestæ, may be given

---

1 [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

in evidence to affect his principal. What constitutes a part of the res gestæ?

[Cited in Horner v. Fellows. 1 Doug. (Mich.) 54; Franklin Bank v. Pennsylvania, D. & M. Steam Nav. Co., 11 Gill & J. 34; Haven v. Brown, 7 Greenl. 424; Franklin Bank v. Steward. 37 Me. 526. Cited in brief in Crump v. U. S. Mining Co., 7 Grat. 364.]

8. After the money brought into court under the condemnation is paid over to the collector, the court has no power to decree in favour of the informer against the collector in personam, or against money of his in court, arising from some source other than the admiralty proceeding.

9. The appellate court may sustain the appeal in part, and dismiss it in part; on the ground that as to such part, the case could not be brought up for review upon appeal.

[Appeal from the district court of the United States for the district of New Jersey.]

In admiralty.

Griffith & Halsted, for appellant.

Pennington & Elmer, for appellee.

WASHINGTON, Circuit Justice. This is an appeal from a decree of the district court. The appellee filed in that court five several petitions, claiming a right to one fourth of the proceeds of the sales of the sloop Boxer. the sloop Tonkin, ten hogsheads of rum, and two barrels of oil, three hogsheads of rum. and the penalty of the coasting license bond of the Tonkin; which sloops, rum, and oil. had been seized, condemned, and sold. for a violation of the revenue laws of the United States, in pursuance, as the petitions allege, of information given to the collector by the petitioner, and the proceeds paid into the hands of the clerk of the court; and which penalty had been recovered in pursuance of like information, and the amount collected by the marshal and paid into court. The petitions were separately applicable to these four separate forfeitures and the penalty. and prayed to be paid out of each fund one fourth of the same, after the costs and charges were deducted. To the three petitions which claimed one fourth of the proceeds of the sloop Tonkin, the two parcels of rum and the oil. the appellant, the collector who made the seizures, filed separate answers, in which he denied that Bradford was the informer, and insisted that if he ever had any claim as such to a part of the proceeds, the same was forfeited by his misconduct in conspiring with the owners of the rum to destroy it, during the time that he was charged with the custody of it by the appointment of the collector, for the purpose of destroying all evidence of the illegal importation of that article, and of defrauding the revenue of the United States. And lastly, that subsequent to the condemnation, and to the filing of these petitions, viz. on the 4th of May, 1822, the petitioner had, for a valuable consideration paid to him, released to the respondent all his claim, as informer, to any part of the forfeitures of those articles. The answer to the petition respecting the Boxer.

denies that the petitioner was the informer, and insists upon the release stated in the other answer, which included his claim to a part of the forfeiture of this vessel. To the petition concerning the penalty of the license bond, the collector pleaded the same matters as are set forth in his answer to the petitions respecting the Tonkin, the rum, and the oil.

To these answers and plea the petitioner replied, that, on the 14th of February, 1822, he did, for a valuable consideration paid to him by Peter Cambloss, by an instrument under his hand and seal, assign to said Cambloss, all his right and title in and to all moneys which he was or might be entitled to from the sales of the said sloops, rum and oil, as informer against the same; and also to all moneys and penalties due, or to grow due, and to be recovered by reason of his said information given to the collector.

A number of depositions having been taken, the district court decreed in substance as follows: That Bradford was originally entitled, as informer, to one fourth of the sales of the sloops Boxer and Tonkin, the thirteen hogsheads of rum, and two barrels of oil, after expenses deducted; and also to one fourth of the penalty of the coasting license bond of the Tonkin. That having, by an instrument dated in February, 1822, assigned all his said interest to Peter Cambloss, he, the said assignee, is entitled to the same. That the sum of $250, then remaining in the hands of the clerk of the court, which had, by the order of the court, been detained out of the proceeds of the two sloops, the rum and the oil; and also the sum of $500 in his hands, arising from the suit of the United States against the obligors in the said license bond, after legal fees deducted, be paid to —— Elmer, the then collector, to be by him disposed of as follows: viz. that he shall consider the five several prosecutions in the petitions mentioned as one connected transaction; that the proceeds of the sloops, rum, and oil, amounting to $2,037.34 cents, out of which Westcot received for the parties concerned, the sum of $1,787.34 cents, of which the United States was entitled to $1,018.67 cents, and said Westcot to $509.33 cents, and Cambloss, as assignee aforesaid, to $509.33 cents; and that said Westcot had in his hands, after paying himself and the United States, the sum of $259.33 cents, belonging to Cambloss, assignee as aforesaid. It was therefore decreed, that the said Elmer pay the said sum of $250, remaining in the hands of the clerk, on the sales of the sloops, rum, and oil, when the same shall be paid over to him by the clerk, io Cambloss, in part of his proportion of said sales; and that he pay to the United States one half of the sum paid over to him by the clerk in the suit of the United States on the license bond; and to Cambloss, as assignee, one fourth of the last mentioned sum; and the remaining fourth, being the proportion due to the said Westcot, as collector, be also paid to said Cambloss, in part

of the sum due him on the sales of the sloops, rum and oil, and which has been received by said Westcot. And that the said Westcot pay to Cambloss the balance, which will, after the payments aforesaid, remain due to him on the net proceeds of the sloops, rum, and oil. Each party to pay his own costs.

The first question which I have to consider is one raised by the counsel for the appellee, in which is involved an objection to the jurisdiction of this court, upon the ground that these petitions were not in the nature of original suits, but were merely appendages to the suits which brought the funds in question into court, and that as no appeals were taken from the decrees in these suits, none will lie from the present decree, which was merely incidental, and dependent upon the discretion of the court below. That the decree made in these cases is final, was not in direct terms, controverted by the counsel, nor could it be with the slightest plausibility. The whole fund remaining in court, which formed the subject of these petitions, is finally disposed of by the decree, as concerns all the parties interested in it: the United States; the collector who made the seizure; and the assignee of the informer. Final judgment, in personam, is rendered against Westcot for the balance still due to Cambloss. Nothing remained to be done but to execute the sentence of the court.

The whole strength of the objection to the jurisdiction was rested by the counsel upon another ground; it was, that the petitions were not original suits, but that they were merely incidents, to be decided upon according to the discretion of that court; in like manner as that court would take cognizance of the manner in which its process to enforce its decree had been executed. But how can these petitions be considered as appendages, or incidents, to the original suits? They were totally unconnected with them; were instituted by a third person against the collector, for the purpose of controverting his right to the fund in court, the fruit of certain suits brought by the United States, to a proportion of which the petitioner claimed a right. They formed no part of the original suits, which were terminated by the fruits of them being brought into court; but were original suits to recover a part of those fruits; as much so, as a suit by petition or otherwise, in the admiralty, by material men, to be paid out of a surplus remaining in the registry, which had been brought there upon a libel to enforce a lien on the ship; which is unquestionably an original suit, from a final decree in which an appeal will lie.

This is quite unlike the case of The Hollen [Case No. 6,608], which came before the court upon a petition of the obligors in a stipulation bond for the appraised value of goods which had been seized and libelled, against whom judgment was rendered, as a matter of course, the appraised value not having been paid into court, according to a previous order of the

court." The prayer of the petition was, that the execution issued against the petitioners might be superseded; and from the decree upon the petition the petitioners appealed. The circuit court decided, very correctly, I think, that the subsequent proceedings on the bond, and the issuing of the execution, were but incidents to the original cause. to enforce the decree of condemnation, and that that court had no jurisdiction over those proceedings unless it had possession of the cause to which they belong. The stipulation bond is the representative of the subject upon which the decree of condemnation operates; and as well might the owner of the property condemned, appeal from an order of the court relative thereto, but distinct from the original suit in which the decree was made, as the obligors in the case referred to, where no appeal was, or would have been taken from the original decree. In this case the court has nothing to do with the original suits, but is confined to the right of the petitioner in the court below to a proportion of the fund, which had been brought into the court, as he alleged, in pursuance of information given by him to the collector. It must. however, be understood that this opinion is confined to that part of the decree which relates to the proceeds of the sloops, the rum, and the oil; the original proceedings against which being on the admiralty side of the district court, the subsequent suits against those proceeds in the court, must also be considered as suits in the admiralty, since to that side of the court the petitions were necessarily addressed. The decree, therefore, as to those proceeds, was properly brought before this court by appeal. But the other petition, which claimed one fourth of the penalty recovered on the license bond, was not, and could not be addressed to the admiralty side of the court, since the money was levied under a judgment at common law; and although it was in the hands of the same officer who had possession of the proceeds in the admiralty suits. still the petition in relation to that fund. was. in reality. a proceeding at common law: and the judgment of the court therein. is. of course, a judgment at common law. It follows. therefore, that the decree of the court upon this petition. cannot be carried by appeal into the circuit court. I entirely concur with Mr. Justice Story in the construction which he has given to Act March 3, 1803. § 2 [2 Stat. 244]. in U. S. v. French [Case No. 15.165], that the term "judgment" is merely explanatory of, and equivalent to "decree," the other phrase used in that section; and therefore, that an appeal does not lie to the circuit court in common law suits.

I shall now proceed to the consideration of the various objections made by the appellant's counsel to the decree of the court below, upon the petitions for one fourth of the proceeds of the sloops, the rum, and the oil. The first is, that the right of Bradford as an informer. however well founded it might originally have been, was forfeited by reason of his subsequent misconduct. That his conduct after the seizure of the Tonkin and the rum. and during the time that they were left in his custody by the deputy collector, was in the highest degree perfidious, and was calculated and intended to defraud the revenue of the United States by putting it in the power of the owners of the property to destroy or secrete the rum, is clearly proved, and the fact does not stand in need of the confirmation afforded by his own confession contained in the disgraceful petition filed by him for the purpose of defeating the right of Cambloss, to whom he had assigned it for a valuable consideration, and for promoting that of Westcot, to whom he made a subsequent assignment. But the question is, could his right, if it once existed, be forfeited or lost by his subsequent misconduct, whether it consisted in acts of commission, or in omissions? What is the right of an informer, and when does it attach? The ninety-first section of the collection law of March 2, 1799, c. 22 [1 Stat. 697], enacts that all fines, penalties, and forfeitures, recovered by virtue of that act, and not otherwise appropriated, should, after deducting all proper costs and charges, be disposed of; one moiety to the United States, and the other moiety to be divided between the collector, the naval officer and surveyor, or such of them as may be in the said district. But in all cases where such fines, penalties and forfeitures shall be recovered in pursuance of information given to such collector by any person other than the naval officer or surveyor, then one half of such moiety is to be given to such informer. It is plain that this section requires no act whatever to be performed by the informer, subsequent to the information given to the collector. The mere information can vest no right whatever in him, unless in the case of a forfeiture it is followed up by a seizure, and unless a suit is brought, when a penalty is to be recovered. The collector seizes at his peril. and he may refuse to act upon the information he receives, and the informer has no remedy that I know of. to compel him to seize, or to bring suit. If he make the seizure in consequence of the information given to him, that act vests an inchoate right to the forfeiture, in the United States. the custom house officers, and the informer, in the proportions mentioned in this section, which right is consummated by condemnation. All this was decided in the case of Jones v. Shore's Ex'rs, 1 Wheat. [14 U. S.] 417. After seizure, the subsequent proceedings to consummate the rights of the several parties having an interest in the forfeiture. are under the exclusive management of the collector. The informer is not bound to aid in the prosecution by providing testimony to support it; much less is he bound to assist in the safe keeping, or conveying the property seized from one place to another. He may. undoubtedly. as might any other person. undertake. at the instance of the collector. to navigate the vessel seized, from one place to another, and in

the mean time to take care of the property. But in that case he acts in a new character, that of a special agent of the collector, responsible, it may possibly be, to him or to the United States, in a proper form of action, for the faithful discharge of the trust reposed in him; but upon no principle with which I am acquainted, can his breach of faith involve the forfeiture of a right which had vested in him in his character of informer. I am quite at a loss to conceive how his merit as informer, to which the recovery of the forfeiture is mainly to be attributed, can be extinguished by his subsequent demerit as agent. Still less can there be a reason assigned for visiting him with the forfeiture of his rights in the former character, when his offence consists in intention only, or in vain efforts to do an injury to others, but which failed to produce the contemplated result, as happened in this case.

2. The next objection is, to the power of the district court to direct a distribution of the proceeds of the forfeited articles remaining in the registry. That courts of common law as well as courts of equity and of admiralty, possess a controlling power over money brought into those courts respectively by their process, is undeniable. It is every day's practice in the common law courts, upon rules to show cause, or upon motion, to examine into and decide the claims of third persons to money levied under execution, and paid into court. The same control is exercised by the court of admiralty over moneys in the registry, as upon petition of material men and privileged creditors, to be paid out of such fund, although it was brought in upon the suit of other creditors. The Jerusalem [Case No. 7,294]; Ex parte Lewis [Id. 8,310]; Gardner v. The New Jersey [Id. 5,233]; The Favourite, 2 C. Rob. Adm. 232; The John, 3 C. Rob. Adm. 288. But the main strength of the objection, as I understand it, rests upon the peculiar expressions of the eighty-ninth section of the collection law of March 2, 1799, c. 128 [1 Story's Laws, 573; 1 Stat. 695, c. 22], which authorizes the collector to receive from the court or its officer, the sums recovered or collected, after costs and charges deducted, and enjoins upon him the duty of making the distribution. This is considered by the counsel as being imperative on the court, and ousts its general jurisdiction to direct the distribution. I think there is no ground for this argument. The above section merely points out the officer who is to receive the money from the court, and who is to distribute it, where no dispute exists respecting the distribution. But the jurisdiction of the court to examine into contested claims to the money, whilst under its control, and to direct the collector in what manner it is to be distributed, is not taken away, or even impliedly affected. If, upon general principles, this could be questioned, I consider the point to have been directly settled in the case of Jones v. Shore's Ex'rs, in 1 Wheat. [14 U. S.] 417, before referred to.

3. The next objection is to the quantum decreed to the informer, or rather to his assignee. It is insisted, that since the information was in writing, that instrument must regulate the amount of the forfeiture to which the appellee is entitled. The terms of this written information are, "that the informer verily believes that certain goods viz. seven hogsheads of rum, which have been brought into the United States contrary to law, are now on board the Tonkin, Seth Sharp, master, lying in Antuxit creek, and he engages to pay the costs of the prosecution for the same." If this were the only information which was given, I should certainly consider myself bound by its language, fairly and reasonably expounded; and I shall, for the present, consider the case as if there were no other evidence of information given by Bradford at the time this instrument was signed, or at any other time. What is its extent in legal contemplation? It is contended by the counsel for the appellee, that the seizure of the other six hogsheads of rum, and the oil of the Tonkin, and also of the Boxer, was consequential to the limited information thus given, and that therefore it entitled the informer to a share of the proceeds of those vessels, and the other articles on board the Tonkin. On the other side, it is insisted, that the right of the informer should be strictly confined to one fourth of the proceeds of the seven hogsheads of rum. My own opinion is, that the one construction is much too liberal, and the other too strict. The expressions of the ninety-first section are, that "in all cases where such penalties, &c. are recovered in pursuance of information given to such collector," he shall be entitled, &c. The question then is, what was recovered in pursuance of the above information? It is admitted that the forfeiture of the seven hogsheads of rum was so recovered. I think it equally clear that the forfeiture of the Tonkin was recovered in pursuance of the information, because, by the twenty-eighth section of the same law, it is enacted, that if any goods which shall have been unladen contrary to the other provisions of the act from on board any vessel, shall be put into any other vessel, except in a case of accident or distress, &c. such vessel shall be forfeited. Now it is clear that the information against the rum on board the Tonkin was, to all intents and purposes, an information against the Tonkin, since her forfeiture was necessarily the consequence of the forfeiture of the rum, and was therefore recovered in pursuance of the information given to the collector. But I do not think that the written information can fairly be construed to apply to the Boxer; which was, for aught that that instrument intimates, totally unconnected with the Tonkin, and in no wise implicated in her guilt. The effect of that information, taken in connection with the parol evidence, as to the remaining six hogsheads of rum and the oil, will be considered hereafter.

It remains now to inquire, whether, in point of fact, the collector received any infor-

mation from Bradford which led to the seizure of the Boxer, the residue of the rum, and the oil? For that he was at liberty to give evidence of parol information, more extensive than that contained in the written instrument alluded to, is unquestionable. Shaw deposes, that James D. Westcot, Jr., the deputy collector, stated to him, some time after the seizure, that Bradford had complained against the two sloops and seven hogsheads of rum; and that some time during the fall of 1821, he also stated that Bradford had informed him that the Boxer had brought in rum from Bermuda. Barret, another witness, deposes, that he was employed by the deputy collector to come in the Boxer from Antuxit to Bridgetown, where the collector's office was kept, about the middle of November, 1821, a day or two after she was seized, and that the Tonkin came round about the same time; that whilst they were unlading the Tonkin, Bradford mentioned to him that he was the informer; and that as they were returning from the store house where the rum had been deposited, the witness told the deputy collector what he had just heard from Bradford; to which he replied, that Bradford, a few days prior to this conversation, had informed him that the Tonkin was going down the creek with a load of wood, and that there was rum on board that came in the Boxer. John Elmer deposes, that he was at the collector's office the day the written information was signed by Bradford and the seizure made, and he thinks that the deputy collector stated that the rum came out of Cropper's store, and he understood, both from him, and from Bradford, that the latter had informed respecting the rum, but he cannot affirm that any thing was said about the Boxer. These are all the witnesses who have given evidence on this point, and the question to be decided is, can the declaration of the deputy collector be given in evidence against his principal? As hearsay evidence, it is inadmissible by the general rule of law. But this rule is subject to certain exceptions, one of which is, that the declarations of an agent, so far as they constitute a part of the res gestæ; or in other words, such as are made by him, either at the time he is engaged in making a contract on the part of his principal, or is performing some act within the scope of his authority; may be given in evidence to affect his principal. It is admitted as the representation or admission of the principal himself, whom the agent represents, whilst engaged in the particular transaction to which the declaration refers. Representations made by an agent, at the time he is contracting for his principal, constitute a part of the contract, as much so as if they had been made by the principal. And for the same reason, a fact admitted, or stated by an agent, in relation to a transaction in which he is then engaged, and whilst it is in progress, forms a part of that transaction, and is to be considered as the admission of the principal.

This is well illustrated by the case of Mott v. Kip, 10 Johns. 478, which was an action on the case against the sheriff for a false return to a fieri facias, in which it was held by the court, that the acknowledgement of the sheriff's deputy, made to the plaintiff's attorney, in answer to inquiries respecting the execution, and while the execution was in force, was admissible evidence to charge the sheriff; for the declarations being made in relation to the business of the execution, and while the obligation to execute it remained in force, they were made in the course of the transaction, and were to be considered as part of the act of the deputy, touching the execution. Now to apply this principle to the present case. What was the transaction in which the deputy collector was engaged, and to which his admissions, stated by the witnesses, related? It was the seizure of certain property for an alleged forfeiture, and the security of the same in the mode deemed necessary by that officer. As soon as the Tonkin and the rum were seized, they were placed under the care of Bradford, to be safely kept and conducted to Bridgetown. Thither also the Boxer was brought; and I am therefore prepared to admit, that, until the vessels arrived at that place, and possibly until the rum, the cause of the alleged forfeiture, was stored; the transaction to which the admissions referred was open and continuing, and that admissions made during that time, as to the cause of the seizure, might be considered as part of the res gestæ, as explanatory of the ground on which the seizure was made. But evidence of subsequent declarations by that officer, I hold to come within the general rule of the law, and are therefore inadmissible. The evidence of Shaw is of an acknowledgement made by the deputy collector some time after the seizure, but without fixing precisely how long. Barret is more precise, and states that it was after the rum was secured in the store that the admission was made that Bradford was the informer. If the admission at that time could be regarded as evidence, I can perceive no reason why it might not be so, had it been made the next day, or the next week. Elmer speaks to the time when the written information was signed, but then he has no recollection that the Boxer was mentioned. I am of opinion, therefore, that there is no proof that the seizure of the Boxer was made in pursuance of information given by Bradford.

As to the remaining six hogsheads of rum not mentioned in the written information, I think there are many circumstances in the case to warrant the conclusion to which, after much hesitation, my mind has arrived; that the seizure of them was made in consequence, either of the written, or of some parol information given by Bradford to the deputy collector. The whole quantity of rum was found together in the hold of the Tonkin, and as it is not pretended that the marks upon them were such as to distinguish

any seven hogsheads from the remaining number, it is quite natural that the collector, acting upon the maxim "noscitur a sociis" was led to conclude that the whole were equally guilty. It was but a fair and reasonable construction of the information given to the collector, that it was intended to be against the rum on board the Tonkin, but that the former was mistaken as to the precise number of hogsheads that were on board. I will not say that, if there were no other evidence in the cause but the written information, I should come to this conclusion. But there are some circumstances attending this instrument, which, taken in connection with Elmer's testimony, incline me strongly to suspect that the parol information given by Bradford was not truly inserted by the deputy collector in the written one, probably from his having misunderstood what was stated. It is very obvious that Bradford is an ignorant man, at least in respect to the business he was engaged in, or he would have known that the law did not require him to verify his information by an oath, much less to bind himself to pay the costs of the prosecution, with which he had nothing to do. It is not to be supposed but that the officer knew better; yet he was the person who wrote the instrument, and who administered the oath. This suspicion, that the verbal information was not correctly taken down, is greatly strengthened by the evidence of Mr. Elmer, who was present when it was given, and who states that the deputy collector mentioned that the rum on board the Tonkin came from Cropper's store, and that he understood both from him and Bradford, that the latter had informed respecting the rum, and not any particular number of hogsheads. Now it was admitted by the counsel that the rum, after it was illegally landed from the Boxer, was placed in Cropper's store; and since it is obvious that the deputy collector proceeded, in the first instance at least, upon Bradford's information, it may fairly be inferred that the knowledge of the place whence the rum was taken was derived from the same source, and that the guilt of the article to be proceeded against, and not the number of hogsheads, was, in the view of both parties, the substantial matter of the information. I am therefore of opinion that Bradford ought to be considered as the informer against the thirteen hogsheads of rum and the Tonkin, but not against the Boxer and the oil.

The only remaining question is, whether the decree of the district court, which directs the collector to pay to the assignee of Bradford whatever sum he was entitled to, over and above the $250 retained by the court, out of the $509, the sum recovered in the common law suit, and that the appellant should pay the balance which might remain due to Cambloss, after the payment aforesaid, on the net proceeds of the forfeitures, be correct or not? I am clearly of opinion that it is not. The only ground upon which that court could, on its ad-

miralty side, take cognizance of the petitions for a proportion of the forfeiture was, that the money was in its possession, and under its control. Those petitions were all suits in rem, and after the money was paid over to the collector, it was placed beyond the reach of the court, and no decree could properly be made in personam against Westcot, nor against money to which he was entitled in the hands of the clerk on the common law side of the court, which constituted no part of the fund in the registry of the admiralty arising from the sales of the forfeited property. As to the $250 remaining in the registry, the decree is right, unless it should exceed the sum to which Cambloss is entitled as his proportion of the proceeds of the Tonkin and the rum, and will be incorrect only so far as it may exceed such proportion, which excess, if any, ought to be decreed to be paid to the appellant. But should it turn out that the $250 are insufficient to satisfy the claim of the appellee, his only remedy, if any he has, will be an action at law against the appellant, as for money received to his use. I say nothing as to the decree on the petition to be paid one fourth of the penalty of the license bond, because that case, as before observed, is not before the court; and as to that, the appeal must be dismissed, but without prejudice.